# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
June 25, 2013 Session

## STATE OF TENNESSEE v. JESSICA M. MYERS

**Appeal from the Criminal Court for Greene County**
**No. 09-CR-396      John Dugger, Jr., Judge**

---

**No. E2012-01814-CCA-R3-CD - Filed September 27, 2013**

---

The defendant, Jessica M. Myers, was indicted on one count of first degree (premeditated) murder of Jimmy Cutshall, three alternative counts of first degree (felony) murder of Jimmy Cutshall, and one count of attempt to commit first degree murder of Rhonda Cutshall.  A jury found her guilty of the first four counts as charged and of the lesser-included offense of reckless endangerment on the fifth count.  The trial court merged the felony murder convictions.  The defendant was sentenced to life in prison for counts one and two, and she was sentenced to serve eleven months and twenty-nine days on count five, with all sentences to be served concurrently.  On appeal, the defendant challenges the sufficiency of the evidence, an alleged defect in the indictment in count one, and the admission of certain post-mortem photographs as cumulative evidence at trial.  Having reviewed the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Francis X. Santore, Jr., Greeneville, Tennessee, for the appellant, Jessica M. Myers.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; C. Berkeley Bell, District Attorney General; and Cecil C. Mills, Jr. and Ritchie Collins, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The crimes at issue took place after the defendant and her then-boyfriend, Shawn Jones, were involved in altercation with the victims about some pills.  In the early morning

hours of the day after the altercation, October 13, 2009, the defendant and Mr. Jones broke into the victims' trailer home. The first victim, Jimmy Cutshall, was shot several times and killed, and the second victim, Rhonda Cutshall, was shot in the head but survived. Unbeknownst to the perpetrators, a witness was hiding in the bathroom and telephoning emergency responders during the shootings. Chad Rader drove the defendant and Mr. Jones to and from the crime.

At trial, Deputy Jimmy Morgan of the Greene County Sheriff's Department testified that after 5:00 a.m. on the morning of October 13, 2009, he received a dispatch regarding a burglary in progress. He and Deputy Greg Tipton responded and arrived in five to seven minutes. The dispatcher had informed police that a witness was hiding in the bathroom of the home and communicating with 911, that the witness had heard gunshots, and that the gunman might still be at the scene. Deputy Morgan testified that there was at least one vehicle at the home, and he scanned the vehicle or vehicles for occupants. The front door of the mobile home was ajar two to three inches. Deputy Morgan identified himself and demanded any occupant to come out, then tried to open the door. The door hit an obstacle and swung back, but Deputy Morgan was able to push it aside enough to allow entry. He then realized that the door had been blocked by the body of the first victim, Jimmy Cutshall, who was lying on the floor in the blood-soaked living room. Deputy Morgan secured the common areas of the home as Deputy Tipton and Sergeant Glenna Estep went down a hallway to the bedrooms. The 911 caller was found in the bathroom. Deputy Morgan then heard the officers discover a second victim, Rhonda Cutshall, who had also been shot. Medical help was summoned for the second victim, and the first victim was determined to have died at the scene.

Brian Keith Holt responded to the shooting at 5:30 a.m. for the Greene County EMS. He testified that the second victim was lying on the floor between the bed and closet with injuries to her face and head, and she was saying that her head hurt and that she couldn't hear. Mr. Holt determined that she had puncture or gunshot type wounds to the face and head and transported her to the hospital.

Glenna Estep, a sergeant with the Greene County Sheriff's Department, testified that she received a call regarding the burglary between 5:30 and 6:00 a.m. on October 13, 2009, and that she responded within five to six minutes. Sergeant Estep initially went to secure the back of the home but found the door locked, and she was summoned to the front when Deputy Morgan discovered the first victim. Sergeant Estep testified that the 911 caller emerged from the bathroom upset and in shock. The second victim was lying on the floor and saying she could not see or hear. Sergeant Estep then photographed the scene, including the victims, prior to the arrival of medical help. Sergeant Estep identified a photograph of bullet casings on the floor near the second victim.

Chastity Renner, the 911 caller, testified that she was romantically involved with the first victim's son, who was incarcerated at the time of the murder; the second victim was the first victim's wife. Ms. Renner testified that she had taken the second victim and another man to the defendant's house the Sunday before the shootings to get a speaker box and that she had first met Shawn Jones at that time.

On the evening before the shooting, the defendant, Mr. Jones, and their little boy were at the victims' home. Ms. Renner arrived at around 6:00 or 7:00 p.m. and saw the defendant arguing with the second victim, who was accusing the defendant of stealing pills and who was searching the defendant's vehicle and person. The first victim then told the defendant and Mr. Jones to leave. Mr. Jones said, "[W]e'll be back." Mr. Jones and the defendant began to depart but left the child on the porch; Mr. Jones then came back and put the child in their car.

Ms. Renner testified that the second victim went to sleep around 1:00 or 2:00 a.m., having taken some medication which made her groggy. The first victim looked into the bedroom at the end of the trailer, where the second victim and, apparently, Ms. Renner were sleeping, around 3:00 a.m. to check on them. At 5:18 a.m., Ms. Renner received a call from her boyfriend on her cell phone, and as a result of speaking with him, she retrieved the cordless phone and shut herself into the bathroom. Ms. Renner immediately heard a loud "boom" and heard the first victim screaming. She lay down in the bathtub, pulled the shower curtain closed, and called 911. Ms. Renner heard people running and the first victim screaming. Then she heard people walk down the hall and heard the second victim scream. At one point, she hung up with the 911 operator because he was loud and she was afraid the intruders would hear him. Eventually, the police retrieved Ms. Renner, who walked past the first victim covered in blood and went outside. Ms. Renner was asked to identify any potential suspects, and she told the police about the altercation between the victims and the defendant and Mr. Jones and "how mad they were."

On cross-examination, Ms. Renner confirmed that she did not know who the intruders in the house were. She also testified that Mr. Jones was the one who threatened to come back and the defendant did not make threats.

Dr. Scott Dulebohn, a neurosurgeon at Johnson City Medical Center, treated the second victim after the shooting. He testified she had a wound in the lower part of the back of her head and bruising around her face. He testified that he performed surgery, removing some brain tissue and bone fragments, and that a part of the bullet she was shot with remained in her brain, in an area involved with vision. She was in danger of losing her life at the time of the shooting and for the first week after surgery. Dr. Dulebohn removed some bullet fragments and bones from the victim's head. Registered nurse Barbara Harrington and

operating room shift leader Mary Ball testified to giving the bullet and bone fragments to police.

Forensic pathologist Teresa Campbell testified that the first victim suffered multiple gunshot wounds. The gunshot wound in the right side of the victim's face exhibited stippling and soot on the skin and blackened gunpowder embedded in the skin, indicating it was a close range shot. The victim was also shot at close range in the left shoulder and in the right thigh, and he was shot from further than two feet away in the left of his neck and in his lower abdomen. Dr. Campbell recovered bullet fragments from the shot to the victim's face, the shot to the victim's shoulder, the shot to the victim's neck, and the shot to the victim's abdomen. The victim tested negative for drugs and alcohol. Laura Parsons and Emily Lemieux gave the bullet fragments and the victim's blood sample to police.

Angie Weems, an evidence technician with the Greene County Sheriff's Department, testified that she processed the crime scene, creating a videorecording of the area. Ms. Weems testified that the front door looked like it had been forced open. She also documented shell casings at the scene and took the casings to the Tennessee Bureau of Investigation for analysis. She photographed gunshot wounds to the first victim's face, legs, and stomach. She also secured as evidence empty bottles of prescription medicine and over $500 cash recovered from the first victim's wallet.

Ms. Weems testified that she later participated in the search of Mr. Jones's residence, where officers found a large number of shell casings in the yard. Ms. Weems collected a random sample of casings from each area in which they were found because the casings were too numerous to be taken in their entirety. She also collected ammunition for a .22 long rifle and a Winchester Wildcat .22 from a kitchen cabinet. Ms. Weems also identified the buccal swabs which she took as DNA evidence.

Ms. Weems testified that the defendant's mother brought police a black pocketbook containing the second victim's social security card, benefit security card, and a prescription for Roxycodone. The pocketbook also contained several pieces of identification belonging to the defendant, including a driver's license, social security card, insurance card, debit card, and high school graduation card. Cash in the amount of $378 was confiscated from Mr. Jones.

Ms. Weems then participated in the search of the residence of Chad Rader. Ms. Weems testified that she secured a Glenwood Model 60 rifle from a tree outside Mr. Rader's residence. Ms. Weems also recovered a bullet, an orange ski mask, and a toboggan with a stain from a Jeep Cherokee driven by the defendant and her boyfriend and sent these items out to be tested.

-4-

On October 14, 2009, the day after the crimes, Ms. Weems participated in another search of Mr. Jones's residence, where police recovered from a bedroom a bag of clothing which had not been there the previous day. The clothing was soiled with mud, weeds, and burrs. The items in the bag were a pair of jeans, a pair of black athletic pants, two camouflage ski masks, two pairs of tennis shoes, two pairs of socks, two dark T-shirts, an orange towel, a dark hoodie, a Pink Floyd hoodie, one glove, and a Dale Earnhardt T-shirt and hat. Ms. Weems sealed each item separately and sent them out to be tested.

Ms. Weems testified that a gunshot residue test was performed on the defendant and that her fingerprints were taken along with those of Mr. Jones and Mr. Rader. Ms. Weems also received four bullets or bullet fragments from the first victim's autopsy, as well as a sample of his DNA.

On cross-examination, Ms. Weems testified that the prescription in the pocketbook was from Florida and that the four prescription bottles had been filled in Florida. She acknowledged that the clothing which was recovered from Mr. Jones's home had been in one bag together, increasing the likelihood of cross-contamination.

John Huffine was working as a detective with the Greene County Sheriff's Department when the crimes were committed, and Detective Huffine took Ms. Renner's statement. Detective Huffine ordered a search pursuant to consent of the defendant's vehicle and obtained Mr. Jones's consent to search the home he shared with the defendant. Detective Huffine found an area where someone had apparently been target shooting and recovered numerous .22 caliber bullet casings, which were consistent with the casings from the crime scene. The door of the defendant's residence looked like it had been kicked in. Detective Huffine testified that some of the ammunition in the kitchen cabinet was consistent with the brand of ammunition used in the shooting. He testified that there was no bag of clothing at the residence. Detective Huffine returned to the station and asked the defendant's mother to come and bring a pocketbook which he had been alerted was involved in the case. He identified the pocketbook and the items inside, including the several pieces of identification belonging to the defendant and to the second victim, which were all inside a wallet. Detective Huffine participated in the interview of Mr. Rader, which led to the recovery of the gun from the tree at Mr. Rader's residence and the recovery of the clothing during the second search of Mr. Jones's home. On cross-examination, Mr. Huffine testified he did not know who had been shooting at targets at the home of Mr. Jones and the defendant. He acknowledged that placing items into one bag could increase the risk of cross-contamination.

Jeff Morgan, a detective in the Greene County Sheriff's Department, was in charge of processing the crime scene. He testified that the wound to the first victim's head showed a halo from the muzzle blast, powder stippling, and bruising, indicating it was inflicted from

approximately four or five inches away. According to Detective Morgan, the first victim was shot through two arteries and that there were large amounts of blood. The front door had been kicked in and appeared to be the point of exit for the intruders. He testified that Mr. Jones signed a consent to search his residence and the Jeep.

Detective Morgan testified that he and Sergeant Danny Ricker took a statement from the defendant at around 3:30 p.m. on October 13, 2009; this was her second statement to police. Although the statement is missing from the exhibits on appeal, it was read into evidence. In the statement, the defendant said that she and Mr. Jones had gone to Wal-Mart at around 2:00 a.m., and Mr. Jones purchased two camouflage masks. They then went to Mr. Rader's house. After some time, they came into town and got something to drink. Mr. Jones then had the defendant drive to the victims' home. She dropped Mr. Jones and Mr. Rader off at a gate and circled around before picking them up. Mr. Jones had told her they were going to "score" some pills, and the defendant denied knowing that they were planning to hurt anyone. The two men were quiet when they got in the car, and the defendant and Mr. Jones took Mr. Rader home. After the two were stopped by the sheriff and asked to go to the police station, Mr. Jones made a phone call and told someone to kick in the door and get rid of the gun.

On cross-examination, Detective Morgan acknowledged that the statement was not a verbatim account of what the defendant had said but stated that the defendant was asked to review the statement and make any changes necessary.

Vincent Tweed of the Greene County Sheriff's Department conducted the previous interview with the defendant at around 8:30 a.m. on October 13, 2009, when the defendant gave her first statement. A recording of the statement was played for the jury but is not among the exhibits in the appellate record.[1] Detective Tweed also assisted in the recovery of the gun from Mr. Rader's home. Detective Tweed denied that the defendant was slurring words during the interview but described her as slow and tired.

The Greene County Sheriff, Steve Burns, testified that he went to the defendant's mother's home to see if he could locate the defendant and Mr. Jones. He met them pulling up to the house and asked them to come to the station. The defendant was carrying a

---

[1]An unofficial transcript provided to aid the jury shows generally that the defendant denied knowing anything about the crimes. She vaguely cast suspicion on her own cousin, Matthew Blake, who was, according to the defendant, having an affair with the second victim, and on the first victim, who she claimed was abusing the second victim. Having been informed of the second victim's shooting, she noted that she loved the second victim and that the second victim had some of her sunglasses, which she wanted returned. She at first denied then admitted to the altercation the previous day regarding the pills the second victim accused her of stealing.

pocketbook, and Sheriff Burns gave her permission to give it to her mother.

Detective Danny Ricker testified that he found a plastic bag full of clothing in a bedroom at the home of the defendant and Mr. Jones. Detective Ricker took a statement from the defendant at 2:20 p.m. on October 14. The defendant told Detective Ricker about the conflict over the pills at the victims' home, recounting that she had previously given money to the second victim, that the second victim laid some pills out, and that she took the pills because she thought the second victim was paying her back with them. She took the pills to the car but gave them back when the second victim confronted her. She stated that the second victim told them that they shouldn't return to the house but that she would meet them elsewhere. Mr. Jones then began to talk about robbing the victims of their pills. The defendant and Mr. Jones went to Wal-Mart, where the defendant believed Mr. Jones stole two camouflage masks. Mr. Jones loaded a gun and wiped down some bullets, and they went to Mr. Rader's home. Mr. Rader took them to a gate and dropped them off. Mr. Jones put the masks and some gloves on both himself and the defendant. They approached the home, and the defendant kicked in the door. Mr. Jones "just started shooting," and the first victim fell. Mr. Jones went to the bedroom, and the defendant heard more shots. Mr. Jones returned with the second victim's purse. They left the home, and the defendant felt nauseated. Mr. Rader picked them up, and Mr. Jones gave him some money. At their home, Mr. Jones instructed the defendant to put all the clothing she had worn into a garbage bag and to put it into her two-year-old's room; she stated she thought he put the purse in the bag. Mr. Jones put the gun in the closet. The defendant told police they then left to go to her mother's house. She had told her mother about the shooting, and her mother had agreed to try to go out-of-state to fill a prescription in the second victim's name. She stated that she had told her mother she kicked in the door, one victim "was down," and she thought the second victim "was down" but wasn't sure. Mr. Jones had given her the second victim's identification and the prescription and directed her to put them in her billfold; she gave the billfold to her mother. On the way to the police station, Mr. Jones called Mr. Rader and told him to kick in the door at the defendant and Mr. Jones's home, get the gun and clothing, and dispose of them. Detective Ricker acknowledged that the statement was a paraphrase of what the defendant had said but stated she had reviewed it prior to signing it. The defendant had previously requested a lawyer, but she then made an independent request to speak to officers again. Officer Jennifer Paxton testified that the defendant independently requested to speak to detectives on October 14, 2009, and filled out a form to do so.

The Tennessee Bureau of Investigation's Laura Hodge testified that the gunshot residue tests on the defendant and Mr. Jones were inconclusive. The presence of residue could be affected by the weather, hand washing, wearing gloves, and the passage of time. James Davis conducted gunshot residue testing on the clothing recovered from the

defendant's home and vehicle. The orange mask and toboggan,[2] from the vehicle tested positive for gunshot residue. From the bag of clothing, the baseball cap, one pair of pants, both the gray Pink Floyd hooded sweatshirt and the blue hooded sweatshirt, a sweater, one black T-shirt, one camouflage mask, and one glove showed the presence of residue. He did not find residue on either pair of shoes, one of the pairs of pants, the red towel, one T-shirt, or one camouflage mask,[3] which was also recovered from the vehicle, and did not test the socks because they would have been covered by outer clothing. He testified that the items might have been near gunfire or might have come in contact with a recently fired gun or ammunition and that if the items were stored together they may have picked up residue from one another.

Dan Royce testified that it was possible that three of the bullet fragments recovered from the victim came from the rifle found at Mr. Rader's home, but he could not conclusively say that they did; two of the fragments were too mutilated to be useful for comparison. However, Agent Royce was able to link all of the recovered casings from the victims' home and over thirty casings from Mr. Jones's home to the rifle. The other cartridges from Mr. Jones's home were fired by six different weapons.

Mark Dunlap testified that he created a DNA profile for the three persons accused of the crimes and for the first victim. Agent Dunlap found the first victim's DNA in blood on blue jeans recovered from Mr. Jones's home. He also discovered blood on the black pants from Mr. Jones's home. The second victim's blood was found on the blue hooded sweatshirt. Agent Dunlap also found blood on the glove and found a fingernail inside. The DNA on the glove came from three separate individuals, and the profile could not exclude Mr. Jones, the defendant, and the second victim. The fingernail belonged to the defendant. On cross-examination, Agent Dunlap testified he could not say when the fingernail was left in the glove.

The defendant testified on her own behalf. She testified that she had two children when she began dating Mr. Jones. About four months into the relationship, they got into an argument and he pushed her. Mr. Jones then escalated the physical abuse, hitting her and putting cigarettes out on her. Mr. Jones also hit her toddler. Many of their confrontations were over drugs, particularly if the defendant was under the effect of drugs and Mr. Jones

---

[2]A flannel coat, which the report indicates was recovered from the vehicle, also tested positive for residue; however, Ms. Weems did not testify that this item was found in the vehicle.

[3]A second mask, described as "dark" in the gunshot residue analysis and as "green" in the serology report, did not reveal either residue or DNA. While the reports indicate that it was found in the vehicle, no testimony establishes its origin.

did not have any drugs.  Mr. Jones assaulted her at least once a week.  The defendant introduced photographs showing injuries she sustained when the defendant kicked her.  She also introduced photographs of a cigarette burn inflicted by Mr. Jones on her toddler's leg and scratches on his stomach where he had fallen on rocks after Mr. Jones hit him in 2008. She stated the police were called the day he hit her son and her son fell. She also called the police on another occasion in January 2009, after Mr. Jones became suspicious that she was leaving the house and began hitting her while on speaker phone with her boss, whom she had called to prove she was going to work.  In June 2009, she had been admitted to the hospital with injuries inflicted by Mr. Jones.  Another time, she went to a different hospital to get a splint on her finger.

The defendant then recounted the events leading up to the shootings.  She testified that the Sunday night before the crimes, Ms. Renner, the defendant's cousin Mr. Blake, and the second victim had come to her home because Mr. Jones wanted to purchase Xanax and Roxy pills from the second victim.  Mr. Blake and the second victim had a physical relationship, and she supplied him with pills.  The second victim, who was aware of the defendant's history of domestic abuse, gave her some Xanax pills when the two took some crushed pills into the bathroom; the defendant hid these from Mr. Jones.  The next morning, the defendant woke up before Mr. Jones and took the pills; consequently, Mr. Jones was angry when he woke up and realized she had not shared her drugs.

The defendant and Mr. Jones went to the victims' home, where Mr. Jones was unsuccessful in obtaining pills.  The defendant acknowledged that she stole some pills from the second victim.  The second victim was upset, but the defendant immediately returned the pills.  The second victim asked them not to come back because it upset the first victim but said she would meet them elsewhere.

The defendant and Mr. Jones went back to their trailer home.  They began to argue, so the defendant took her son to her mother's house.  Mr. Jones then pawned an object to obtain money for a pill.  The two went to Wal-Mart and separated in the store.  The defendant was under the effect of drugs, but she did not remember going through the checkout line as they left. Mr. Jones then pulled two camouflage masks out of his pants and said he wanted to rob the victims of their pills.  The defendant told him she would not participate but did not want to confront him further out of a fear he would become abusive. At their home, Mr. Jones began to oil and load a gun.  He then told the defendant to drive to Chad "Mater" Rader's house. Mr. Rader got in the driver's seat, and the defendant got in the back, where the barrel of the gun was pointed towards her as she and Mr. Jones were "still fussing."  Mr. Rader dropped them at a gate.

Mr. Jones got out of the car and opened the defendant's car door.  The defendant went

over the gate, and Mr. Jones came after her; while he was standing on the cattle guard, she kicked him and ran. Mr. Jones caught up to her and kicked her feet out from under her, then forcibly put the glove and mask on her. He pointed the gun at the defendant. They came to another gate, and she kicked him again. Mr. Jones fell into an electric fence but caught up with the defendant on the other side of the trailer and kicked her. Then he told her he "wouldn't think twice about putting a bullet in" her and that if he got caught, she would "go down with him." He told her all she would have to do is kick in the door. She kicked the door but did not try to kick it hard enough to open it. Mr. Jones then kicked it open. The defendant saw Ms. Renner's car but did not know if she was there; she did not mention Ms. Renner's car to Mr. Jones.

The defendant testified that the first victim was on the couch in the home, and Mr. Jones started shooting him. The first victim tried to fight back and shut the door but ultimately fell. Mr. Jones took off running back through the house. The defendant testified the next events were "a blur," and she ran back to the Jeep, stopping to vomit on the way. They drove to Mr. Rader's house and then home. Mr. Jones opened the door but would not allow her to go past it; instead, he made her remove her clothing. The defendant testified she was afraid of Mr. Jones because he had been abusing her and because of prior threats he had made against her and her family. The defendant testified she took several Xanax after returning home.

On cross-examination, the defendant acknowledged that she herself smoked. She identified pictures of Mr. Jones laughing and playing with her son in February 2009 and a diamond ring Mr. Jones had given her around the same time period. She acknowledged having given the second victim money she received for child support in exchange for pills. The defendant stated that police had misunderstood her statement when she said Mr. Jones started talking about robbery when they left the victims' residence; she said he did not talk of robbery until after the trip to the store, and therefore, she did not ask for help at Wal-Mart. She acknowledged not having told police Mr. Jones had pawned something for pills. She acknowledged that her statement saying that Mr. Jones purchased the camouflage masks was untrue. She did not recall giving the statement in which she said she and Mr. Jones and Mr. Rader stopped for drinks, and she testified that that was not true. She also testified that the statement she gave in which she claimed to have dropped off Mr. Jones and Mr. Rader was untrue. She stated that she had mentioned kicking Mr. Jones to Danny Ricker, but it was not in any of her statements. She acknowledged her statement to Danny Ricker indicated she had kicked in the door and agreed that she had made corrections to the statement. She acknowledged she had bought a pink gun in January 2009; however, the defendant testified she had pawned it when she realized Mr. Jones was a felon. She did not testify regarding the origin of the gun used in the crimes. She testified she did not stop the robbery or killing because she could not overpower Mr. Jones. On redirect, she testified that she never held a

gun during the commission of the crimes.

Freddy Myers, the defendant's father, testified regarding Mr. Jones's abuse of the defendant. Mr. Myers stated that the defendant called him on three separate occasions asking for help after Mr. Jones had assaulted her. On each of those occasions, Mr. Myers helped her move away from Mr. Jones. Mr. Myers observed injuries on his daughter, including numerous bruises in various locations, handprints on her body, hair pulled out, and cigarette burns. The defendant's step-mother, Joy Myers, corroborated Mr. Myers's testimony regarding the abuse.

Chad Higginbotham, the defendant's step-brother, also corroborated the fact that the defendant was the victim of domestic violence and observed the same injuries as the Myerses. He also testified to marks he saw on the defendant's toddler, including a cigarette burn and scratches. He acknowledged that the defendant smoked, but he noted that the burns he had seen were on her chest and would not have been accidentally self-inflicted. Mr. Higginbotham's wife, Ashley Higginbotham, confirmed that she had seen the defendant with her hair messed up and her face looking as though it had been hit.

Officer Howard Gale testified that he responded to a domestic violence call at the home of Mr. Jones and the defendant and that the defendant had bruising on the left side of her face. Officer Gale arrested Mr. Jones.

The trial court noted before the close of the State's proof that it had discovered that the indictment for Count One, which charged premeditated murder, did not indicate that a true bill had been returned by the grand jury; the boxes next to "true bill" and "no true bill" were both unchecked. The trial court sua sponte called Ronnie Metcalf, foreman of the grand jury for twenty years, who testified that he could "positively, absolutely say that, yes, in fact, it was a true bill . . . . It was a true bill and I just failed to check [the box]." The defense moved to dismiss Count One based on a defective indictment. The defense noted at the time that "it's not going to skew the state's case because they still have felony murder charges out there." The trial court overruled the motion, noting that the defense did not object after the indictment was read and that the foreman had indicated it was a true bill. The trial court entered an order decreeing that the mistake was a clerical error and that, based on the foreman's testimony, Count One was in fact a true bill.

The defendant was convicted of the first four counts of first degree murder. She was convicted of the lesser included offense of reckless endangerment in count five.

# ANALYSIS

## I. Sufficiency of the Evidence

A guilty verdict "shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The appellate court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The State is entitled to the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). It is up to the trier of fact to assess the credibility of the witnesses and the weight to be given their testimony and to reconcile any conflicts in the proof. *State v. Echols*, 382 S.W.3d 266, 282 (Tenn. 2012). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The appellate court may not reweigh or reevaluate the evidence or substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Evans*, 108 S.W.3d 231, 236-37 (Tenn. 2003). The verdict of guilt also removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant bears the burden on appeal of showing why the evidence is not sufficient to support the jury's verdict. *State v. Franklin*, 308 S.W.3d 799, 825 (Tenn. 2010). The standard of review is the same for a conviction based on circumstantial evidence as it is for a conviction based on direct evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Circumstantial evidence need not exclude every reasonable hypothesis save that of guilt. *Id.* at 381.

First degree murder, as charged in the first count, is "a premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). A person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). A premeditated act is one done after the exercise of reflection and judgment, where the intent to kill was formed prior to the act. T.C.A. § 39-13-202(d). The intent to kill need not exist in the mind of the accused for any definite period of time. *Id.* Premeditation can be supported by evidence of the defendant's declarations of an intent to kill; evidence that the defendant procured a weapon; the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; infliction of multiple wounds; preparations made prior to the killing for concealment of the crime, destruction or secretion of evidence; and calmness immediately after the killing. *State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005).

Felony murder is defined as the "killing of another committed in the perpetration of or attempt to perpetrate" one of a series of enumerated felonies. T.C.A. § 39-13-202(a)(2). Count Two charged the defendant with a killing committed in the perpetration of or attempt to perpetrate robbery. "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). Count Four charged the defendant with a killing committed in the perpetration of or attempt to perpetrate a theft. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). Count Three charged the defendant with felony murder in which the predicate felony was burglary. As relevant here, a burglary is committed when a person, without the effective consent of the property owner, enters a building and commits or attempts to commit a felony, theft, or assault. T.C.A. § 39-14-402(a)(3), -403.

The defendant was also convicted of reckless endangerment of the second victim under Tennessee Code Annotated section 39-13-103. Reckless endangerment[4] is committed when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." *Id.*

The defendant was indicted under a theory of criminal responsibility. Criminal responsibility is not a separate, distinct crime but a theory by which the State can prove the defendant's guilt based upon the conduct of another. *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). A person is criminally responsible "if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401. As applicable here, a person becomes criminally responsible if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2).

> Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible.

---

[4]The jury apparently convicted the defendant of misdemeanor reckless endangerment, although reckless endangerment is a Class E felony if committed with a deadly weapon. T.C.A. § 39-13-103(b) (2006).

*State v. Watson*, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citation omitted). While mere presence is insufficient to support the conviction, encouragement without active physical participation is sufficient. *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008). "To prove guilt through a theory of criminal responsibility, the State must establish that the defendant 'knowingly, voluntarily and with common intent unite[d] with the principal offender[ ] in the commission of the crime.'" *Id.* (quoting *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)).

While the defendant testified that she had told Mr. Jones she would refuse to participate in the crimes; that she attempted to run away during the crimes; that she attempted to kick and attack Mr. Jones on the way to the victims' home; that she accompanied him in part at gunpoint; and that she was a victim of prior abuse and therefore only cooperated out of a well-established fear, the jury was free to reject her testimony. Other evidence, including the defendant's own prior statements, tended to show that she participated in the crimes by kicking in the door, driving Mr. Jones to a third accomplice's house, assisting him in hiding evidence of the crimes, and that she intended to partake of the fruits of the crimes by convincing her mother to use the stolen prescription to obtain pills. The physical evidence showed blood and gunshot residue on multiple pieces of clothing found at the defendant's residence. A rational trier of fact could have concluded beyond a reasonable doubt that she intended to promote or assist the commission of the crimes and that she rendered aid to Mr. Jones.

The evidence is sufficient to support the premeditated murder conviction. Seen in the light most favorable to the State, the evidence at trial showed that the defendant and Mr. Jones were disgruntled about a drug transaction and threatened to return to the victims' home. They went to Wal-Mart at 2:00 a.m., and Mr. Jones stole two masks. Mr. Jones declared his intent to rob the victims. Mr. Jones retrieved and loaded his weapon, wiping down the bullets, then contacted a third accomplice, Mr. Rader. The defendant drove Mr. Jones to Mr. Rader's home, and the three went to the victims' residence. The defendant kicked the victims' door in, and Mr. Jones immediately started shooting. During the crimes, the first victim, unarmed, was shot multiple times and killed. Afterwards, the defendant and Mr. Jones hid their clothing and the weapon. Then the defendant contacted her mother, told her about the murder, and asked for her help in using the second victim's stolen prescription. The evidence was sufficient to establish the defendant's criminal responsibility for a premeditated murder of the first victim.

The evidence was also sufficient to support the convictions for felony murder. Mr. Jones told the defendant his intention to rob the victims. The second victim was shot in the head during the home invasion, and Mr. Jones left with her purse. A few hours after the crimes, the defendant gave her mother a pocketbook containing the second victim's

identification, including her social security card and a prescription in the second victim's name. The defendant told police that she and Mr. Jones intended to use the second victim's prescription to obtain drugs. A rational trier of fact could have concluded that the defendant and Mr. Jones intentionally or knowingly obtained or exercised control over the second victim's property without her consent, either with or without the use of violence and fear, with the intent to deprive her of the property, and that the first victim was killed in the perpetration of the crime. Likewise, the jury could rationally have found beyond a reasonable doubt that the defendant and Mr. Jones, in kicking down the victims' door, shooting them, and absconding with the prescription and identification, had entered the building without their consent and committed a felony, theft, or assault.[5] Certainly, the evidence was sufficient to sustain the reckless endangerment conviction, as the conduct of the defendant and Mr. Jones, at a minimum, was reckless and placed the second victim in imminent danger of death or serious bodily injury.

We conclude that the evidence is sufficient to support the verdicts. However, we note that the trial court, while it merged two of the felony murder convictions into the third, did not merge the felony murder convictions with the first degree murder conviction. Accordingly, we vacate the judgments and remand for entry of judgment sheets reflecting merger of the premeditated murder conviction into the felony murder convictions.

## II.  Defective Indictment

The defendant next asserts that the indictment charging her with first degree premeditated murder was fatally defective because the grand jury foreman had neglected to

---

[5]We note that Count Three of the indictment charges the defendant with felony murder committed in the course of burglary rather than aggravated burglary, which is the burglary of a habitation. T.C.A. § 39-14-403(a). The proof at trial established that the burglary was of the victims' residence. Burglary is a lesser-included offense of aggravated burglary. *State v. Emesibe*, No. M2003-02983-CCA-R3-CD, 2005 WL 711898, at *4 (Tenn. Crim. App. Mar. 28, 2005). In *State v. Wilson*, the defendant objected at jury instructions for a predicate felony of aggravated burglary when the indictment charged burglary, and this Court stated that "[n]ecessarily included in the list of requisite felonies is any other grade of the same felony." *State v. Wilson*, No. M2011-00004-CCA-R3-CD, 2012 WL 3041451, at *16 (Tenn. Crim. App. July 25, 2012). In *Wilson*, the Court concluded that the indictment "automatically encompassed a murder committed in the perpetration of any burglary, including an aggravated burglary." *Id.* Other cases have more narrowly concluded that where the indictment charged burglary as the predicate felony and the proof established that the burglary was aggravated, there was a substantial correspondence between the indictment and the proof such that the defendant had adequate notice of the charges against him and protection from double jeopardy. *See State v. Seals*, No. E2007-02332-CCA-R3-CD, 2009 WL 55914, at *10 (Tenn. Crim. App. Jan. 9, 2009).

indicate on the face of the document that the grand jury had found a "true bill."[6] The facial validity of the indictment is a question of law, which we review de novo. *Dykes v. Compton*, 978 S.W.2d 528, 529 (Tenn. 1998).

The Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution provides that the accused has the right to know "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to meet these constitutional requirements, an indictment must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy. *State v. Lindsey*, 208 S.W.3d 432, 438 (Tenn. Crim. App. 2006).

Tennessee Code Annotated section 40-13-105 requires the concurrence of twelve jurors returning an indictment, which, with the concurrence of twelve jurors, "shall be endorsed a 'true bill,' and the endorsement signed by the foreman." This procedure is mandatory. *Applewhite v. State*, 597 S.W.2d 328, 329 (Tenn. Crim. App. 1979). A number of older cases emphasize the necessity of a properly endorsed and signed indictment. *Martin v. State*, 155 S.W. 129, 130 (Tenn. 1913) ("Numerous cases hold that indictments, in order to their validity, must be so indorsed, followed by the signature of the foreman of the grand jury."). Unless the record reflects that the indictment was returned to court as a "true bill" by the jury "it can[]not appear that it has been before them, and found by them." *State v. Muzingo*, 1838 WL 1096, at *1 (Tenn. 1838). "The original indictment without the indorsement, 'A true bill,' followed by the signature of the foreman of the grand jury, is utterly worthless, and devoid of any legal efficiency whatever." *State v. Herron*, 7 S.W. 37, 38 (Tenn. 1888).

However, Tennessee Rule of Criminal Procedure 12(2)(B) requires a motion alleging a defect in the indictment, presentment, or information to be made prior to trial. Defects which must be challenged prior to trial are those which are not challenges to jurisdiction but "go to matters of form rather than substance." *State v. Nixon*, 977 S.W.2d 119, 121 (Tenn. Crim. App. 1997). "These statutory requirements include, in part, failure of the district attorney general to sign the indictment, the identity of the person charged, the time at which the offense was committed, and the place of the offense." *Id.*

---

[6]The defendant contends on appeal that this error should result in the dismissal of all charges against her, including the felony murder convictions which properly indicate that a "true bill" was returned by the grand jury. The defense provides no authority for the proposition that a defect in one count of the indictment invalidates all the other counts charged. Moreover, the defendant explicitly waived this argument by arguing to the trial court that only the first count should be dismissed and that the State could still proceed on the other counts. Accordingly, this argument is waived. Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 36(a).

On the other hand, if the error alleged is that the indictment is so defective that it fails to vest jurisdiction in the court or to charge an offense, the motion may be heard at any time during the pendency of the case. Tenn. R. Crim. P. 12(2)(B). A valid indictment is an essential jurisdictional element, and without it, an offense may not be prosecuted. *Wyatt v. State*, 24 S.W.3d 319, 323 (Tenn. 2000). Thus, an indictment which fails to allege an element of an offense is a nullity, and failure to challenge it prior to trial does not result in waiver. *State v. Perkinson*, 867 S.W.2d 1, 6 (Tenn. Crim. App. 1992); *see* Tenn. R. Crim. P. 12(2)(B); *State v. Carter*, 988 S.W.2d 145, 148 (Tenn. 1999). Here, the defendant did not object to the indictment prior to trial; therefore, if the defect did not affect the court's jurisdiction, it was waived.

In *Applewhite v. State*, this Court concluded that the endorsement and signature on the indictment were mandatory. *Applewhite*, 597 S.W.2d at 329. Nevertheless, the Court went on to hold:

> However, the majority rule appears to be that the failure to endorse or sign the indictment does not deprive the trial court of jurisdiction over the person of the defendant or the offense, so as to make any resulting conviction void . . . . This is because in modern pleading practice (which tends to be less hypertechnical than its common law predecessor), the foreman's signature has come to be viewed as "a procedural safeguard rather than a substantive requisite of an indictment," such that "its presence or absence does not materially affect any substantial right of the defendant; and . . . neither assures to him nor prevents him from having a fair trial."

*Applewhite*, 597 S.W.2d at 329 (quoting *Nicholas v. Thomas*, 382 S.W.2d 871, 872 (Ky. 1964)). The Court in *Applewhite* ultimately held that the defendant's failure to make an objection prior to trial to the lack of the foreman's signature had resulted in waiver. *Id.* at 330.

While the *Applewhite* Court wrote that "failure to endorse *or* sign the indictment" was not a jurisdictional defect, the issue before the Court was a failure of the foreman to sign the document, and the Court noted that there was "an otherwise valid indictment, endorsed 'a true bill,' was properly returned into court." *Applewhite*, 597 S.W.2d at 329, 330 (emphasis added). We note here that the language regarding the finding of a true bill lends itself to confusion. While "endorse" generally is synonymous with "sign," see *Black's Law Dictionary* (9th ed. 2009), the statutory reference appears to be to the actual indication on the document that a true bill was found. T.C.A. § 40-13-105 (requiring that the indictment "shall

-17-

be endorsed a 'true bill,' and the endorsement signed by the foreman") .

Although *Applewhite*'s holding related to the foreman's signature, other unreported cases have addressed the indictment's failure to indicate that a "true bill" was returned. In *Guerrero v. Barbee*, a habeas corpus petitioner alleged that the indictment was defective because it was not endorsed "a true bill." This Court rejected the claim that such a defect deprived the trial court of jurisdiction and merited habeas corpus relief. *Guerrero v. Barbee*, No. W2012-01873-CCA-R3-HC, 2013 WL 1189462, at *4 (Tenn. Crim. App. Mar. 22, 2013). In *Hedges v. Mills*, this Court likewise concluded that various defects, including the failure to endorse several counts as "a true bill," did not deprive trial court of jurisdiction. *Hedges v. Mills*, No.W2005-01523-CCA-R3-HC, 2006 WL 211819, at *2 (Tenn. Crim. App. Jan. 26, 2006). It would appear, based on the cases cited and the dicta in *Applewhite*, that the error is not jurisdictional and was therefore waived when the defendant failed to raise it prior to trial.

We conclude, however, that even if that the failure to endorse the indictment a "true bill" was jurisdictional, was not subject to waiver, was fatal, and invalidated the defendant's conviction for first degree premeditated murder, any such error was clearly harmless.[7] In *State v. Williams*, the trial court failed to dismiss a felony murder charge which did not specify the predicate felony in the indictment. *State v. Williams*, No. W2009-01638-CCA-R3-CD, 2011 WL 1770655, at *10 (Tenn. Crim. App. May 9, 2011). This Court concluded that the indictment was fatally defective, precluding a lawful felony murder conviction, and that the trial court erred in not dismissing the charge, but that the error was harmless because the felony murder conviction was merged with a first degree premeditated murder conviction. *Id.*; *see also State v. Reid*, 164 S.W.3d 286, 312-13 (Tenn. 2005) (concluding that amendment of indictment to change underlying predicate felony before jeopardy attached

---

[7]The State argues that any defect was cured through the testimony of the grand jury foreman and the trial court's order. In *Gunkle v. State*, 65 Tenn. 625, 625 (Tenn. 1872), the indictment was returned to court by the grand jury without the indication that it was a true bill. The Court, noting that it found "no provision of the Code professing to cure such an omission as this, nor do we suppose the defect could be thus cured," dismissed the case against the defendant. *Id.* However, in that case, there was nothing in the record to show that it had been returned a true bill. *Id.* In *Bird v. State*, 52 S.W. 1076, 1076-77 (Tenn. 1899), when the copy of the indictment did not indicate it was a true bill and the original had been lost, the case was remanded to the trial court "to the end that the indictment may be there supplied," although the court noted that affidavits asserting the original indictment was a true bill were "not parts of the record, in a technical sense, and cannot serve the purpose of curing the defect in the indictment as here presented." *Bird*, 52 S.W. at 1077. *Applewhite* also noted that other courts had concluded "that an omission in the endorsement or signature may be cured by amendment to the original indictment." *Applewhite*, 597 S.W.2d at 330. In this case, the trial court issued an order declaring that a true bill had been returned. Because we conclude that the defendant will not, in any event, be entitled to relief on this issue due to the merger of the offenses, we do not address the trial court's efforts to cure the defect.

was proper, and noting that in any case, the two convictions for felony murder were merged with two convictions for first degree premeditated murder); *State v. Chambers*, No. M2001-02674-CCA-R3-CD, 2003 WL 1913871, at *9 (Tenn. Crim. App. Apr. 22, 2003) (holding that even if the trial court erred in not granting acquittal on felony murder count, the error was harmless because the count merged with the first degree murder conviction). On remand, we direct the trial court to merge the conviction for premeditated murder in Count One into the conviction for felony murder in Count Two. The defendant is not entitled to relief based on an error in the indictment.

### III. Photographic Evidence

The defendant next suggests that the trial court erred in allowing post-mortem photographs of the first victim and a photograph of the second victim's injuries because they were cumulative of oral testimony. The defendant has waived this argument because he has failed to identify which particular photographs he finds objectionable. *See* Tenn. Ct. Crim. App. R. 10(b); *State v. Thomas*, 158 S.W.3d 361, 393 (Tenn. 2005) (finding procedural waiver in failure to reference specific photographs complained of but addressing the issue nevertheless).

The defendant has also failed to include in the record the transcript of the hearing at which the trial court ruled on the admissibility of the evidence to which he objects. It is apparent from the exhibits, however, that certain photographs were cropped prior to being admitted as evidence. It is the duty of the appellant to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b).

> It is well-established that an appellate court is precluded from considering an issue when the record does not contain a transcript or statement of what transpired in the trial court with respect to that issue. Moreover, the appellate court must conclusively presume that the ruling of the trial judge was correct, the evidence was sufficient to support the defendant's conviction, or the defendant received a fair and impartial trial. In summary, a defendant is effectively denied appellate review of an issue when the record transmitted to the appellate court does not contain a transcription of the relevant proceedings in the trial court.

*State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990) (footnotes omitted).

The admissibility of photographic evidence lies within the sound discretion of the trial court. *State v. Hall*, 8 S.W.3d 593, 602 (Tenn. 1999). Without a proper record, we have no basis to conclude that the trial court abused its discretion and must "conclusively presume" that the court's ruling was correct. *Draper*, 800 S.W.2d at 493. Regardless, we have little difficulty in concluding that the photographs were properly admitted. While photographs may not be admitted solely to inflame the jury, even gruesome photographs may be admissible if they are relevant to the issues on trial. *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). Photographs should be excluded if their "probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403; *State v. Williamson*, 919 S.W.2d 69, 78-79 (Tenn. Crim. App. 1995). The photographs here were, while unpleasant, not particularly inflammatory, and they were relevant to the issue of intent. The only argument the defendant makes against the admission of the photographs is that they were cumulative of testimony offered at trial. However, "a relevant photograph is not rendered inadmissible merely because it is cumulative." *State v. Morris*, 24 S.W.3d 788, 811 (Tenn. 2000) (appendix) (noting, however, that gruesome and graphic photographs should not be admitted where medical testimony adequately describes the extent of the injury); *see also State v. Carter*, 114 S.W.3d 895, 904 (Tenn. 2003). The defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, we affirm the convictions and the sentences but vacate the judgments and remand so that new judgments may be prepared to reflect the merger of all of the homicide convictions.

_____
JOHN EVERETT WILLIAMS, JUDGE